IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO.: 1:07-CV-1516 |
| v. | ) ) | |
| APAC-SOUTHEAST, INC.,  f/k/a APAC-GEORGIA, INC., | ) ) ) | |
| Defendant. | ) ) | JURY TRIAL DEMANDED |

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

COMES NOW Defendant APAC-Southeast, Inc., f/k/a APAC-Georgia, Inc., by and through its counsel of record, and hereby files its Answer and Defenses to the Plaintiff's Complaint as follows:

### First Defense

Plaintiff's Complaint fails to state a claim upon which relief may be granted.

### Second Defense

No acts or omissions on the part of APAC caused or contributed to the Plaintiff's alleged damages.

### Third Defense

Defendant pleads the defense of release.

### Fourth Defense

Defendant pleads the defense of estoppel.

### Fifth Defense

Defendant pleads the defense of waiver.

### Sixth Defense

Defendant pleads the defense of license.

### Seventh Defense

Defendant pleads the defense of consent.

### Eighth Defense

Plaintiff, at all times relevant, failed to act in APAC's best interest and to deal fairly with APAC and is therefore barred from withdrawing or denying insurance coverage for APAC.

### Ninth Defense

All rights have accrued between the parties, and this Court therefore lacks subject matter jurisdiction over the Plaintiff's claims.

**Tenth Defense**

APAC responds to the numbered paragraphs of Plaintiff's Complaint as follows:

1.

Admitted that Plaintiff is seeking the relief alleged in paragraph 1 of the Complaint, otherwise denied.

## PARTIES

2.

Admitted that Plaintiff seeks a declaratory judgment.  Denied that Plaintiff has stated a proper claim for declaratory judgment.

3.

Admitted that APAC is a Georgia corporation, otherwise denied.

## JURISDICTION AND VENUE

4.

Admitted.

5.

Denied.

6.

Admitted.

7.

Denied.

## THE POLICY

8.

Denied as stated, but admitted that APAC serves as a general contractor in the business of roadway construction.

9.

Admitted that Costello Industries, Inc. ("Costello") was obligated pursuant to a subcontract it entered into with APAC to procure insurance protecting APAC from all claims arising out of the subcontract and naming APAC as an additional insured. Otherwise, denied to the extent the allegations in the Complaint suggests that the language recited is complete or accurately depicts the terms and conditions of the subcontract regarding Costello's obligations to procure insurance on behalf of APAC. The subcontract speaks for itself.

10.

Admitted that Liberty Mutual Insurance Company ("Liberty Mutual") issued a policy of insurance, Policy No. YY2-111-255229-022/9 ("Liberty Mutual Policy"). Exhibit A appears to be a copy of the Liberty Mutual Policy.

11.

Admitted that there is language to the effect cited by Liberty Mutual in the additional insured endorsement to the Liberty Mutual Policy.  Otherwise, denied to the effect the allegations suggest that the language recited is complete or accurately depicts the terms and conditions of the additional insured endorsement.   The endorsement speaks for itself.

12.

Admitted that there is language to the effect cited by Liberty Mutual in the Liberty Mutual Policy.  Otherwise, denied to the effect the allegations suggest that the language recited is complete or accurately depicts the terms and conditions of the Liberty Mutual Policy.  The Liberty Mutual Policy speaks for itself.

## THE UNDERLYING LAWSUIT

13.

Admitted.

14.

Admitted that Liberty Mutual accepted APAC's tender of defense of the Graves Lawsuit on February 9, 2006.  Otherwise, denied that Liberty Mutual accepted APAC's tender of defense under a reservation of rights.   Further denied

that Liberty Mutual provided separate legal defenses to APAC and Costello immediately after accepting APAC's tender of defense of the Graves Lawsuit.

15.

Denied.

16.

Denied.

## REQUEST FOR DECLARATORY JUDGMENT

17.

APAC realleges and incorporates by reference herein its answers, defenses and allegations included in paragraphs 1 through 16 of its Answer, as though set forth herein in their entirety.

18.

Admitted that Liberty Mutual is indebted to APAC for the full limits of the Liberty Mutual Policy because of APAC's settlement of the Graves Lawsuit. Otherwise, denied.

19.

Denied.

20.

Denied that APAC voluntarily settled the Graves Lawsuit without Liberty Mutual's consent, and further denied that Liberty Mutual is entitled to any of the relief requested in paragraph 20 of the Complaint or in subparts A and B of the WHEREFORE prayer for relief.

## COUNTERCLAIM

21.

By filing the above-styled action, the Plaintiff submitted to the jurisdiction of this Court.  Venue is proper in this Court because Liberty Mutual resides within the judicial district.

## FACTUAL BACKGROUND

22.

On or about May 28, 2002, APAC-Southeast, Inc. ("APAC") entered into a contract to serve as prime contractor on a construction project that was owned by the Georgia Department of Transportation ("GDOT"), Project ID No. B10957-02-000-0, located in Monroe County, Georgia (hereinafter the "Project").  APAC's work on the Project consisted of, *inter alia*, concrete paving and rehabilitation work on the southbound lanes of Interstate 75 in Monroe County, Georgia.

23.

APAC entered into a subcontract dated July 30, 2002 ("Subcontract") with Costello Industries, Inc. ("Costello"), whereby Costello agreed to perform certain services on behalf of APAC in accordance with the terms and conditions of the Subcontract.   A true and accurate copy of the Subcontract is attached hereto as Exhibit A.   Costello's Subcontract work consisted primarily of concrete rehabilitation work.

24.

The Subcontract provided that Costello was to "provide and maintain the necessary and acceptable traffic control devices for [Costello] to set closures in accordance with the [prime contract] specification for closures."

25.

The Subcontract obligated Costello to procure, *inter alia*, comprehensive general liability insurance which named APAC as an additional insured with primary coverage and which shall "indemnify, defend and protect [APAC] from all claims, expenses and liabilities in any way connected with any act or omission of [Costello] … regardless of whether [APAC] is partially at fault."

26.

Pursuant to the terms and conditions of the Subcontract, Costello, by and through its insurance agent, supplied APAC with an insurance certificate evidencing that APAC had been named as an additional insured on Costello's commercial general liability, which was issued by Liberty Mutual Insurance Company ("Liberty Mutual") and an excess liability insurance policy, issued by The Insurance Company of the State of Pennsylvania ("ISCP"), in the manner provided for by the Subcontract.   A true and accurate copy of the insurance certificate is attached hereto as Exhibit B.

27.

APAC is an additional insured on Liberty Mutual Policy No. YY2-111-255229-022/9 ("Liberty Mutual Policy") and, according to its terms and conditions, is afforded $1,000,000 in coverage for liabilities and losses arising out of Costello's performance of the Subcontract work.

28.

On or about September 15, 2003, Messrs. James Graves, Matthew Graves and Stephen Dawson were seriously injured when a vehicle that they were riding in, and which was being operated by Mr. James Graves, collided with a tractor

trailer that was owned and operated by Lorraine Horse Transport. (the "Graves Accident"). The Graves Accident occurred within the confines of a temporary lane closure that Costello had placed during its performance of the Subcontract work.

29.

As a direct and proximate result of the injuries Messrs. James Graves, Matthew Graves and Stephen Dawson suffered in the Graves Accident, a lawsuit was filed against numerous defendants, including APAC and Costello, on behalf of Messrs. James Graves, Matthew Graves and Stephen Dawson. (the "Graves Lawsuit").

30.

The Complaint in the Graves Lawsuit alleges, *inter alia*, that Messrs. James Graves, Matthew Graves and Stephen Dawson sustained serious injuries in the Graves Accident because the temporary traffic control measures that had been placed by Costello created a hazardous and confusing condition for motorists.

31.

At the time of the Graves Accident, Costello was performing work pursuant to the Subcontract. Costello was solely responsible for placing the temporary lane closure that is at issue in the Graves Lawsuit. The temporary lane closure

complained of in the Graves Lawsuit was set up and placed exclusively by Costello personnel.

32.

Discovery in the Graves Lawsuit suggested that Costello unilaterally made changes to various aspects of the traffic control plan to be implemented on the Project.  The plaintiffs in the Graves Lawsuit alleged that such conduct on the part of Costello was negligent and proximately caused and/or contributed to the Graves Accident.

33.

Following service of the Graves Lawsuit upon APAC, APAC demanded that Costello and its insurers indemnify and defend APAC from any and all costs arising out of the Graves Lawsuit.

34.

On or about February 9, 2006, Liberty Mutual, Costello's commercial general liability insurance carrier, acknowledged that APAC was entitled to indemnity and defense under the Liberty Mutual Policy and accepted APAC's tender of indemnity and defense of the Graves Lawsuit.   Liberty Mutual accepted APAC's tender of defense of the Graves Lawsuit without issuing a reservation of

rights and, by and through such action and subsequent conduct, thereby waived the opportunity to disclaim coverage or other policy or coverage defenses with respect to the Graves Lawsuit.

35.

On or about July 25, 2006, the plaintiffs in the Graves Lawsuit submitted a written offer of compromise to fully and finally settle and resolve all claims against APAC, Costello and GDOT arising out of the Graves Accident.  The offer of compromise outlined alleged contractual breaches on the part of Costello that allegedly created liability on the part of Costello, APAC and GDOT.  The offer of compromise also outlined the prospects for a judgment against said defendants that could substantially exceed Costello's available insurance policy limits.  The offer of compromise offered to settle the claims at issue within Costello's available insurance policy limits.  APAC was an additional insured on the subject insurance policies and was therefore afforded all privileges, rights and protections of Costello on said insurance policies.

**CLAIMS AGAINST LIBERTY MUTUAL**

36.

APAC realleges and incorporates by reference herein its assertions and

12

allegations included in paragraphs 21 through 35 of its Counterclaim, as though set forth herein in their entirety.

37.

APAC is an additional insured on the Liberty Mutual Policy, and, as such, Liberty Mutual has a duty and obligation to act in APAC's best interest and in the manner provided for by the terms and conditions of the Liberty Mutual Policy. APAC is a proper claimant under the Liberty Mutual Policy.

38.

On or about February 9, 2006, Liberty Mutual acknowledged that APAC was entitled to indemnity and defense as an "additional insured" under the Liberty Mutual Policy that it had issued on behalf of Costello and APAC and accepted APAC's tender of indemnity and defense of the Graves Lawsuit. Liberty Mutual waived any rights it may have otherwise had to deny coverage to APAC or to invoke defenses to coverage to APAC under the Liberty Mutual policy.

39.

Thereafter, Liberty Mutual substituted its preferred counsel to represent APAC in the Graves Lawsuit. At that time, Liberty Mutual assigned a "conflict claims adjuster" to coordinate with Liberty Mutual's designated counsel on behalf

of Liberty Mutual.   Significantly, Liberty Mutual's "conflict claims adjuster" disclosed to APAC that he had no settlement authority, and that Costello's Liberty Mutual claims adjuster had sole authority to make settlement offers in the Graves Lawsuit.

40.

Following receipt of the Graves Lawsuit plaintiffs' July 25, 2006 offer of compromise, and based upon the legitimate, reasonable risk that an adverse judgment in the Graves Lawsuit could exceed the available insurance policy limits, APAC made a formal demand upon Costello, Liberty Mutual, and Costello's excess insurance carrier, ICSP, to settle the Graves Lawsuit within the available insurance policy limits.   APAC made several additional demands to Liberty Mutual to settle the Graves Lawsuit.   Significantly, however, Liberty Mutual simply failed to respond to both (a) the Graves Lawsuit plaintiffs' settlement demands and to (b) APAC's demands that it settle the Graves Lawsuit.

41.

After the expiration of the Graves Lawsuit plaintiffs' July 25, 2006 offer to settle their claim against APAC had expired, the Graves Lawsuit plaintiffs' submitted a demand, via a letter dated December 15, 2006, to APAC to settle their

claims solely against APAC.  The demand comprised a demand for APAC's first layer of "named insured" insurance policy limits and was set to expire on January 14, 2007 – less than one month prior to the February 12, 2007 specially set trial date for the Graves Lawsuit in Monroe County Superior Court.

42.

Following receipt of the December 15, 2006 demand for APAC's first layer of "named insured" insurance coverage, APAC, by and through email between counsel for all parties to the Graves Lawsuit, agreed to mediate the case with the Graves Lawsuit plaintiffs.  Liberty Mutual was simultaneously notified of APAC's willingness to mediate the Graves Lawsuit.  The Graves Lawsuit plaintiffs agreed to mediate the case only if the mediation could be conducted on January 9, 2007 – approximately 1 month before the trial was to begin in the Graves Lawsuit.

43.

Given the looming expiration of the Graves Lawsuit plaintiffs' December 15th demand for APAC's first layer of "named insured" insurance coverage, APAC agreed to mediate the Graves Lawsuit on January 9, 2007.  Liberty Mutual was copied on all relevant correspondence and was fully aware of the intent of APAC to mediate the Graves Lawsuit.  Liberty Mutual consented to the scheduling of the

January 9, 2007 mediation of the Graves Lawsuit.

44.

Prior to the Graves Lawsuit mediation, Liberty Mutual's designated counsel for APAC in the Graves Lawsuit prepared a case evaluation, which was addressed to Liberty Mutual, which evaluated the settlement value of the Graves Lawsuit at an amount exceeding the Liberty Mutual Policy limits, with a likely adverse verdict range substantially in excess of the Liberty Mutual Policy limits. The case evaluation was supplied to Liberty Mutual prior to the January 9th Graves Lawsuit mediation.

45.

The Graves Lawsuit mediation took place as scheduled on January 9, 2007, and APAC settled the claims against it for an amount in excess of the Liberty Mutual Policy limits. At Liberty Mutual's directive, Liberty Mutual's appointed counsel for APAC attended and participated in the scheduled mediation. Moreover, Liberty Mutual's appointed counsel for Costello also attended and participated in the scheduled mediation. Indeed, even the excess carrier's counsel for Costello attended the scheduled mediation on behalf of Costello. All parties to the Graves Lawsuit were represented at the mediation. Liberty Mutual's

representatives were kept informed of the progress of the settlement negotiations throughout the mediation.   Significantly, two lawyers that had been retained directly by Liberty Mutual were present throughout the entire course of the mediation. Liberty Mutual consented to APAC's settlement of the Graves Lawsuit for a figure exceeding the Liberty Mutual Policy limits.   Liberty Mutual waived any rights it may have had to object to APAC's settlement of the Graves Lawsuit. Alternatively, Liberty Mutual is estopped from objecting to APAC's settlement of the Graves Lawsuit.

46.

During the mediation, Liberty Mutual's designated counsel for Costello offered to settle the Graves Lawsuit for an amount in excess of the Liberty Mutual Policy limits.  Costello's counsel had authority from Liberty Mutual to offer its full policy limits to settle the Graves Lawsuit at the January 9, 2007 mediation – and Liberty Mutual in fact directly offered its full policy limits to settle the Graves Lawsuit during the January 9th mediation.

47.

The Graves Lawsuit plaintiffs' rejected Costello's offers of compromise at the January 9th mediation.  APAC settled the Graves Lawsuit plaintiffs' claims

against it for an amount in excess of the Liberty Mutual Policy limits at the January 9th mediation.

48.

Following settlement of the Graves Lawsuit claims against APAC, all conditions precedent to recovery of the full policy limits had been satisfied by APAC, and APAC demanded that Liberty Mutual tender its full policy limits to the Graves Lawsuit plaintiffs' on behalf of APAC in the manner required by the Liberty Mutual Policy.

49.

APAC's "conflict claims adjuster," which had been appointed by Liberty Mutual to coordinate with APAC's Liberty Mutual designated counsel on behalf of Liberty Mutual and who had previously advised APAC that he had no settlement authority, then advised APAC that he would consult with Costello's Liberty Mutual claims adjuster for further direction.

50.

Thereafter, Liberty Mutual, for the first time, advised APAC that it would not tender the Liberty Mutual Policy limits to the Graves Lawsuit plaintiffs on behalf of APAC, instead claiming that APAC "voluntarily" issued payment to the

Graves Lawsuit plaintiffs in contravention of the Liberty Mutual Policy obligations. Liberty Mutual simultaneously advised APAC that it was purportedly withdrawing its agreement to provide APAC with a defense in the Graves Lawsuit. APAC was forced to fund the entire settlement of the Graves Lawsuit out of its own monies, and APAC has done so.

51.

The Liberty Mutual Policy provides valid and collectible insurance coverage on behalf of APAC for the Graves Lawsuit. All conditions precedent to APAC's recovery of the Liberty Mutual Policy limits have been satisfied or waived, and APAC is presently entitled to recover the full Liberty Mutual Policy limits.

**BREACH OF CONTRACT**

52.

APAC realleges and incorporates by reference herein its assertions and allegations included in paragraphs 21 through 51 of its Counterclaim, as though set forth herein in their entirety.

53.

APAC is an additional insured on the Liberty Mutual Policy. As an additional insured, Liberty Mutual owed APAC a fiduciary and contractual duty to

act in APAC's best interests.  Liberty Mutual has intentionally, and in bad faith, breached its fiduciary and contractual obligations to APAC, for which APAC hereby demands all damages allowed by law.

## FRAUD, ESTOPPEL & BAD FAITH

54.

APAC realleges and incorporates by reference herein its assertions and allegations included in paragraphs 21 through 53 of its Counterclaim, as though set forth herein in their entirety.

55.

Upon information and belief, Liberty Mutual deliberately concealed the fact that Costello's excess insurer was denying, or intended to deny, that APAC was an additional insured on Costello's excess insurance policy.  Liberty Mutual, by and through its contractual and fiduciary relationship with APAC, was obligated to work in good faith to protect APAC's interests.   In contravention of these obligations, Liberty Mutual, in bad faith, worked directly against the interests of APAC.

56.

Liberty Mutual, by its words and conduct, caused APAC to believe that

APAC was afforded coverage for the Graves Lawsuit by both Liberty Mutual and ICSP. Liberty Mutual was aware that APAC believed itself to be insured by ICSP, and Liberty Mutual fraudulently concealed ICSP's intentions to deny coverage to APAC on the excess insurance policy. APAC detrimentally relied upon Liberty Mutual's actions and misrepresentations concerning APAC's status as an additional insured on the ICSP excess insurance policy in the conduct of its defense of the Graves Lawsuit. Liberty Mutual is equitably estopped from denying the full policy limits of the Liberty Mutual Policy to APAC for the damages APAC has incurred as a result of the Graves Lawsuit.

57.

Liberty Mutual's failure to disclose ICSP's intended denial of coverage, as well as its failure to tender the Liberty Mutual Policy limits on behalf of APAC to resolve the Graves Lawsuit, was undertaken in bad faith and entitles APAC to damages afforded by O.C.G.A. § 33-4-6. In addition, Liberty Mutual is liable to APAC for the attorneys' fees and costs incurred by APAC to prosecute this action and for the attorney's fees and costs which remain unpaid from the Graves Lawsuit. Liberty Mutual is further liable to APAC for the full amount of the Liberty Mutual Policy limits as payment toward satisfaction of the settlement payment that APAC was forced to pay to the plaintiffs in the Graves Lawsuit.

Alternatively, Liberty Mutual is liable to APAC for the full amount of the settlement payment it was forced to make to the Graves Lawsuit plaintiffs to settle the Graves Lawsuit.

58.

Liberty Mutual's collusion and cooperation with ICSP, at APAC's expense, as well as Liberty Mutual's bad faith conduct toward APAC shows willful misconduct, malice, wantonness or that entire want of care which raises the presumption of conscious indifference to consequences and entitles APAC to an award of punitive damages against Liberty Mutual pursuant to O.C.G.A. §51-12-5.1.

59.

Alternatively, Liberty Mutual acted negligently when it misrepresented ICSP's intentions during the course of the Graves Lawsuit and when it refused to tender its policy limits to settle the Plaintiffs' claims in the Graves Lawsuit.

## COVENANT OF GOOD FAITH

60.

APAC realleges and incorporates by reference herein its assertions and allegations included in paragraphs 21 through 59 of its Counterclaim, as though set

forth herein in their entirety.

61.

Liberty Mutual has breached the covenant of good faith and fair dealing it owed to APAC and is liable for all damages arising therefrom.

## STATUTORY BAD FAITH AND STUBBORN LITIGIOUSNESS

62.

APAC realleges and incorporates by reference herein its assertions and allegations included in paragraphs 21 through 61 of its Counterclaim, as though set forth herein in their entirety.

63.

Pursuant to the provisions of O.C.G.A. § 33-4-6, APAC demanded that Liberty Mutual tender its policy limits to APAC as required by the Liberty Mutual Policy. Liberty Mutual refused to comply with APAC's request. More than 60 days have passed since APAC demanded that Liberty Mutual tender its policy limits, and Liberty Mutual has wrongfully refused to tender its policy limits. Liberty Mutual's refusal to tender its policy limits was undertaken in bad faith, and APAC is entitled to recover all damages from Liberty Mutual provided for under O.C.G.A. § 33-4-6.

64.

Liberty Mutual knowingly, and in bad faith, engaged in a pattern of conduct that was designed to breach and/or undermine its fiduciary and contractual obligations to APAC, as is evidenced by Liberty Mutual's above-described conduct.   Liberty Mutual has been stubbornly litigious and has caused APAC unnecessary trouble and expense in its actions toward APAC, entitling APAC to litigation expenses and attorneys' fees under O.C.G.A. § 13-6-11.

## EQUITABLE SUBROGATION, PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT

65.

APAC realleges and incorporates by reference herein its assertions and allegations included in paragraphs 21 through 64 of its Counterclaim, as though set forth herein in their entirety.

66.

APAC is equitably subrogated to the full policy limits of the Liberty Mutual Policy.

67.

Liberty Mutual offered its full policy limits to settle the Graves Lawsuit at

the January 19, 2007 mediation of the Graves Lawsuit.  APAC relied upon use of the Liberty Mutual Policy limits when settling the Graves Lawsuit, and Liberty Mutual would be unjustly enriched if it were not required to remit the full limits of the Liberty Mutual Policy to APAC.  Liberty Mutual is therefore estopped from denying coverage to APAC for the full amount of its policy limits, or alternatively the full amount of APAC's settlement of the Graves Lawsuit.

## INDEMNITY AND CONTRIBUTION

### 68.

APAC realleges and incorporates by reference herein its assertions and allegations included in paragraphs 21 through 67 of its Counterclaim, as though set forth herein in their entirety.

### 69.

Liberty Mutual breached its duties to indemnify APAC for the policy limits of the Liberty Mutual Policy for damages arising out of the Graves Lawsuit, and Liberty Mutual is liable to APAC for the full limits of the Liberty Mutual Policy, or alternatively for the full amount of APAC's settlement of the Graves Lawsuit, based upon contractual and common law indemnity, as well as common law contribution.

**WHEREFORE**, Defendant and Plaintiff-in-Counterclaim APAC prays that:

a) APAC be granted a trial by jury;

b) This Court dismiss Plaintiff's Complaint with prejudice and deny Plaintiff all relief requested in its Complaint;

c) This Court enter judgment in favor of APAC and against the Plaintiff on APAC's Counterclaim in an amount to be proved at trial, plus prejudgment and post-judgment interest as provided by law;

d) APAC be awarded its attorney fees and the costs of this action;

e) APAC be awarded punitive damages as determined by the enlightened conscious of the jury;

f) APAC be awarded all damages and all relief allowed in equity and by law against Liberty Mutual; and

g) APAC be granted such other relief as may be just and equitable.

This 17th day of July, 2007.

Law Offices of M. Craig Hall

/s/ M. Craig Hall
M. Craig Hall
Georgia Bar No. 319220
1535 Mt. Vernon Road, Suite 200
Dunwoody, GA 30338
Telephone (770) 698-0555
Facsimile (770)573-3601
CraigHall@DunwoodyLawyers.com

ATTORNEY FOR DEFENDANT
APAC-SOUTHEAST, INC. f/k/a
APAC-GEORGIA, INC.

EXHIBIT A





## SUBCONTRACT

This **Subcontract** is by and between **APAC-Georgia, Inc., Ballenger Paving Division** ("Contractor"), with offices at 900 West Lee Rd. Taylors, SC 29687 (mailing address), P.O. Box 127 Greenville, SC 29602 and **Costello Industries, Inc.** ("Subcontractor") with offices at 123 Costello Rd., Newington, CT 06111 (mailing address) P.O. Box 310444, Newington, CT 06131-0444.

## CONTRACTOR AND SUBCONTRACTOR PROMISE AND AGREE AS FOLLOWS:

Subcontractor shall procure and furnish all materials, labor, supervision, equipment, facilities, supplies, licenses, and permits necessary to perform all work set forth below in the construction of <u>Reconstruction on I-75</u> <u>B10957-02-000-0</u>, located in <u>Monroe County Georgia</u> ("Project") and owned by «OWNER» ("Owner"), in accordance with this Subcontract and the contract between the Owner and Contractor dated May 28, 2002, including all plans, drawings, forms, conditions, specifications and other documents forming or made part of said contract, all of which Subcontractor acknowledges it has reviewed to its satisfaction. The Contract is hereby incorporated by reference and made a part hereof, and Subcontractor is bound to Contractor by the same terms and conditions by which Contractor is bound to the Owner under the Contract. Contractor makes no representation or warranty, express or implied, regarding the adequacy or accuracy of the Contract. Subcontractor shall perform all duties and obligations of the Contractor under the Contract to the extent that such duties and obligations are related, directly or indirectly, to Subcontractor's work. Subcontractor will not do, or fail to do, any act, if such act or failure to act would constitute a breach of the Contract. This Subcontract is made conditional upon its approval, and approval of Subcontractor, by the Owner, if such approval is required under the Contract.

1.    **SCOPE OF WORK:** Subcontractor shall perform and pay for the following work and all incidental work necessary to complete it ("Work"): See **"Attachment A"** page 6 of 9. Any portion of the Work performed prior to the execution of this Subcontract shall be governed by and subject to the terms and conditions of this Subcontract.

2.    **INVESTIGATION OF PROJECT:** Subcontractor has fully acquainted itself with and shall be solely responsible for all physical and nonphysical conditions affecting the Work, the Project site and surrounding conditions, as well as all laws, ordinances, regulations, and governmental requirements applicable to the Work, and the availability of all materials, supplies, and utilities necessary to perform the Work. Subcontractor assumes all risk and expense of any variances between actual conditions and any conditions represented in the Contract or this Subcontract, including but not limited to subsurface conditions, prior work performed by other parties, and the proper removal and disposal of waste and contaminants encountered on the Project. Subcontractor shall immediately notify Contractor in writing of any hazardous material or condition encountered on the Project site, or the release by Subcontractor of any contaminant or substance, the reporting of which is required under any law or regulation.

3.    **EXECUTION AND PROGRESS OF THE WORK:** Time is of the essence of this Subcontract. Subcontractor shall commence the Work when directed by Contractor, and shall prosecute the Work at whatever rate of progress and in whatever sequence as Contractor may direct. Subcontractor shall make all necessary arrangements and coordinate its Work with the Contractor, other subcontractors and the Owner's forces so as not to delay or impair the progress of the Work or the work of others on the Project. Subcontractor shall utilize and maintain whatever lights, barriers, supports, barricades, warning and other safety devices necessary to protect the Work and prevent personal injury or property damage. Subcontractor shall keep the Work area clean, neat and orderly, to the satisfaction of Contractor. Subcontractor's representative on the Project shall at all times have the authority to act in all respects on behalf of Subcontractor. Contractor shall have the sole authority to determine the acceptability or unacceptability of the Work, to reject unacceptable Work, and any decision by Contractor as to any aspect of the Work shall be final. Subcontractor shall not allow any labor dispute, or any claim or dispute in connection with this Subcontract, to in any way delay, interfere with, impair, disrupt, or hinder the Work. Contractor may at any time request Subcontractor to provide adequate assurances that it possesses the capability to complete performance of this Subcontract, and the failure of Subcontractor to supply such assurances to Contractor's satisfaction shall constitute a material breach of this Subcontract.

© 2001 APAC, Inc. Unauthorized Reproduction or Use in Any Form is Strictly Prohibited

4    PAYMENT: Subcontractor shall submit invoices at intervals as directed by Contractor. Subcontractor shall submit with any such invoice whatever affidavits, releases, waivers, and other documents relating to the Work covered by such invoice that Contractor may request. Contractor shall pay Subcontractor within ten (10) days following receipt of corresponding payment from Owner. Such payment shall be limited to the amount of payment that Contractor receives from Owner for the Work, and Contractor may withhold from each payment, other than final payment, retainage of either (i) 2.5%, or (ii) the amount pertaining to the Work withheld by Owner from Contractor. Contractor shall release Subcontractor's retainage within ten (10) days of Subcontractor's satisfactory completion of the Work. Contractor shall have no obligation to make any payment to Subcontractor unless Subcontractor, in Contractor's opinion, is in full compliance with all requirements of this Subcontract. Subcontractor shall bear the risk of nonpayment by the Owner, and payment to Subcontractor shall be wholly contingent and conditioned upon Contractor's receipt of payment from Owner, and in no event shall Contractor be responsible to make any payment to Subcontractor unless and until payment is actually received by Contractor from Owner. Subcontractor shall promptly pay for all labor and materials supplied in the prosecution of the Work. Contractor is entitled and authorized to (iii) withhold from any amount otherwise owed Subcontractor the amount, plus 10%, of any claim for payment of labor or materials allegedly furnished in the prosecution of the Work, (iv) make payment to Subcontractor and any such claimant by joint check, (v) pay any such claimant directly from funds otherwise owed Subcontractor, and (vi) withhold from any amount otherwise owed Subcontractor an amount sufficient, in Contractor's opinion, to compensate for any breach by Subcontractor of any provision of this Subcontract. No payment shall operate as an acceptance of the Work performed or materials furnished.

5.    INSURANCE: Subcontractor shall, and shall cause each of its subcontractors to, maintain (i) worker's compensation and employer's liability insurance to fully protect against loss from personal injury, including death, to any of their employees, (ii) comprehensive automobile liability, general liability (including blasting, collapse and underground, product liability and completed operations coverages,) contractual liability, owners and contractor's liability, builders risk, and property damage insurance, (iii) and any and all other insurance required by the Contract. All such insurance shall be written by insurers acceptable to Contractor, having minimum coverage of $1,000,000 combined single limit, on an "occurrence" basis and not on a "claims made" basis. All policies, except for worker's compensation policies, shall name the Contractor as an additional insured with primary coverage (with any other third-party coverage provided for Contractor to be deemed as excess only) and shall indemnify, defend and protect Contractor from all claims, expenses and liabilities in any way connected with any act or omission of Subcontractor, its invitees, or any person performing Work directly or indirectly on behalf of Subcontractor, regardless of whether Contractor is ~~wholly or~~ partially at fault. All insurance shall expressly provide that all rights of subrogation against the Contractor and the Owner are waived, that no amendment or cancellation of any policy shall be effective until 30 days' written notice to Contractor, and that Owner is an additional insured to the extent that Contractor is required to provide insurance coverage the Owner under the Contract. Before starting the Work, and at any time Contractor so requests, Subcontractor shall furnish certificates satisfactory to Contractor evidencing the required insurance. Neither performance of work by Subcontractor nor any payment by Contractor prior to Contractor's receipt of such certificates shall not diminish Subcontractor's duty to maintain the required insurance or to supply such certificates.

6.    INDEMNITY: Subcontractor shall defend, indemnify and hold Contractor, its officers, employees, agents, insurers, sureties, and parent and affiliated corporations, harmless from any and all losses, consequential damages, expenses (including but not limited to attorneys', consultants' and experts' fees), claims, suits, liabilities, fines, penalties, and remedial or clean-up costs arising out of or in any way related to (i) the performance of the Work, (ii) any breach of this Subcontract , or (iii) any act or omission by Subcontractor, its invitees, or any person performing Work directly or indirectly on behalf of Subcontractor, regardless of whether Contractor is wholly or partially at fault. Subcontractor's indemnity and defense obligations shall apply to any claim against Contractor by any employee of Subcontractor; and Subcontractor shall not assert as a defense in any suit by Contractor to enforce Subcontractor's obligations under this Article 6 any immunity or other defense provided under any worker's compensation or other laws. Subcontractor's obligations under this Article 6 shall not be limited by any other provision of this Subcontract or by any law. Any damages recoverable by Contractor from Subcontractor shall bear interest at the annual rate of 18%, or the highest rate allowed by law, if lower.

7.    CHANGES; EXTRA WORK: Changes and extras in the Work and its scheduling may be made only upon written order by Contractor's authorized representative to Subcontractor, and Subcontractor shall receive no compensation or time extension for any changed or extra Work performed prior to receipt of such order. Any changes in the Subcontract price or time shall be agreed upon in writing by the parties; and if such agreement cannot be reached, Subcontractor shall proceed as directed by Contractor and may submit a claim in accordance with paragraph 15 for any increased costs so incurred.

8.     **TRUST FUNDS:** Any and all funds paid to Contractor or Subcontractor on account of the Work shall be held by each of them in trust: (i) for the payment of such payee's legally enforceable obligations to pay suppliers of labor or materials furnished in the performance of the Work; and (ii) for the payment of any and all liabilities of Subcontractor to Contractor. Neither Subcontractor, nor any person claiming under or through Subcontractor, shall have any legal or equitable interest or ownership rights of any nature in funds held in trust unless and until the purposes and intent of such trust are fully discharged. The holding of funds in trust shall be for the sole benefit and protection of Contractor, and no third party shall have any rights in such funds as a beneficiary or otherwise.

9.     **DELAY:** No extension of time shall be allowed unless Subcontractor submits a written request to Contractor within 48 hours of the commencement of the asserted basis for such request and then only if and to the extent approved by Contractor and Owner in writing, regardless of the asserted basis for such request, and regardless of whether Owner or Contractor is at fault. No damages, additional compensation, or other remedy, shall be granted to Subcontractor for any delay, interference, impairment, disruption, or hindrance that Subcontractor may encounter in performing the Work, regardless of the cause.

10.     **DISADVANTAGED BUSINESS ENTERPRISE:** If Subcontractor is to perform as a Disadvantaged, Small, Minority or Female-Owned Business Enterprise ("DBE"), Subcontractor (i) agrees that all Work required by this Subcontract will be performed, managed and supervised by Subcontractor's own forces, except for Work sub-subcontracted to others with Contractor's prior written consent, and (ii) shall do all things necessary to comply with all applicable federal, state or municipal laws, rules, regulations or ordinances governing the Subcontractor's performance and continuing certification as a DBE so that its performance will count toward Contractor's DBE requirements in the Contract.

11.     **WARRANTY:** Subcontractor shall provide all warranties with regard to the Work as required in the Contract; however, in no event shall such warranties extend for less than one year from the final acceptance date of the Project. Subcontractor shall replace or repair to Owner's and Contractor's satisfaction any material or workmanship in the Work deemed defective by Owner or Contractor.

12.     **COMPLIANCE WITH LAW:** Subcontractor, at its own expense, shall comply with all applicable local, state and federal laws, rules, regulations and ordinances, as amended, including but not limited to those governing: wage and hour, employment, drug-free workplace, safety, hazard communication, material safety data, health, and matters affecting the environment. Subcontractor shall not discriminate against any employee or applicant on the basis of race, color, religion, sex, national origin, age, disability, or veteran status; and Subcontractor shall comply with the **Civil Rights Act of 1964, Executive Order 11246, 41 CFR Part 60** and all other statutes and laws prohibiting any such discrimination. Subcontractor shall cause such legal and regulatory requirements, to the extent required under any law, regulation or the Contract, to be included in any lower-tier subcontract or purchase order, including without limitation Required Contract Provisions Under Federal-Aid Construction Contracts. Subcontractor shall comply with all federal and state antitrust laws, and further represents and warrants that no employee, officer, director or agent of Subcontractor has directly or indirectly entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with the Work.

13.     **SUSPENSION OR TERMINATION:** This Subcontract will terminate, or the Work will be suspended, to the extent that: (i) the Contract terminates or the Owner suspends the Work, in whole or in part, or (ii) Contractor gives written notice to Subcontractor that this Subcontract is terminated or the Work is suspended, in whole or in part. In any of such events, Subcontractor shall immediately suspend or terminate work as appropriate.

14.     **DEFAULT:** If, in the opinion of Contractor, Subcontractor (i) breaches any term of this Subcontract, (ii) fails to provide sufficient skilled labor or materials of proper quality, (iii) fails to repair defective Work, (iv) fails to prosecute the Work promptly and diligently to promote the progress of the Project, (v) becomes insolvent or experiences financial difficulty so that proper performance of the Work is jeopardized, or (vi) becomes disabled from complying with any term of this Subcontract by a petition in Bankruptcy or by appointment of a receiver (each of which is an "event of default"), then Contractor may, at its sole option: (a) declare Subcontractor in default and terminate this Subcontract, effective 12 hours after written notice to Subcontractor; (b) provide any or all of the labor, equipment, and materials necessary to complete the work, and deduct the cost thereof from any money due Subcontractor, and/or (c) take possession of any materials and equipment of Subcontractor in order to finish the Work. Subcontractor shall be liable for any damages or losses incurred by Contractor resulting from an event of default, and Contractor shall have a security interest in and lien upon all materials and equipment of Subcontractor to secure such obligation. If Subcontractor owes Contractor money or has any liability to Contractor for any reason,

whether or not arising under this Subcontract, Contractor may offset such obligation or debt against any monies which Contractor, or any of its corporate affiliates, owes Subcontractor under this or any other contract, subcontract, purchase order or agreement.

15.   **CLAIMS AND DISPUTES:** Subcontractor may submit a claim for extra work or otherwise for additional compensation only as permitted by the Contract and this Subcontract.   Subcontractor shall have sole responsibility for submitting such a claim within the shorter of (a) the time limitations and other requirements as set forth in the Contract or (b) within ten days of the initial occurrence of any event giving rise to such claim. If permitted by law and the Contract, Subcontractor may, at its sole expense, pursue its claim against the Owner in the name of Contractor; but prior thereto, Subcontractor shall enter into a separate written agreement satisfactory to Contractor to indemnify Contractor from any associated costs, expenses, or other losses.   Subcontractor shall have no claim against Contractor for which Owner is not liable or otherwise has not made payment to Contractor; and in no event, shall Contractor have any liability to Subcontractor in excess of any actual recovery from Owner for claims relating to the Work. If any claim or dispute arises relating to this Subcontract, Subcontractor shall immediately make all of its books and records available to Contractor for review and audit. The failure of Subcontractor to initiate legal action relating to any claim arising under this Subcontract within one (1) year shall constitute a full and complete waiver of such claim, regardless of any applicable statute of limitations. In the event that Contractor is required to arbitrate any controversy involving, in whole or in part, the Work, then Subcontractor shall, and shall cause its surety, subcontractors and suppliers to, participate and cooperate fully in the prosecution and defense of such controversy in such arbitration, and be bound by the result; otherwise, any controversy arising under this Subcontract shall be subject to arbitration in accordance with the Construction Industry Rules of the American Arbitration Association at Contractor's sole discretion, and this agreement to arbitrate upon Contractor's exercise of such discretion shall constitute an agreement to submit such controversy to arbitration enforceable under any applicable arbitration statute.

16.   **PAYMENT AND PERFORMANCE BONDS:**  Subcontractor shall provide a separate payment and performance bond, each in the penal amount of this Subcontract, on forms and with sureties satisfactory to Contractor. When separate performance and payment bond are not furnished, retainage will be withheld according to paragraph 4. (I).

17.   **SUB-SUBCONTRACTS:** Subcontractor shall not assign or sublet any portion of this Subcontract or its proceeds without the advance written consent of Contractor. Subcontractor shall incorporate by reference this Subcontract into any sub-subcontract or other agreement covering any portion of the Work. Subcontractor shall, before commencing the Work and at any time requested by Contractor, furnish Contractor a written list of the names of all subcontractors, suppliers and any other entities that may furnish labor or materials in the prosecution of the Work. In any sub-subcontract or contract to procure materials or equipment Subcontractor shall include a provision allowing for termination at Subcontractor's convenience without liability to Contractor or Owner, which Subcontractor shall promptly exercise if requested by Contractor.

18.   **SAFETY:** Subcontractor shall comply with all safety policies and rules of Contractor and Owner, and shall take all actions and precautions necessary to ensure the safety of its employees, the general public, and all other persons on, around, or affected by the Work. **SUBCONTRACTOR further agrees that all its personnel will wear hard hats at all times while performing this work.**

19.   **ENFORCEMENT:** Failure or delay by Contractor to require performance of any provision of this Subcontract shall not be deemed a waiver of its right to enforce such provision, or a waiver of any other right. If any provision of this Subcontract is found unenforceable by any court or tribunal, Contractor and Subcontractor agree that such provision shall be modified to the minimum extent necessary to render it enforceable, and that the remainder of this Subcontract shall not be otherwise affected. The mutual agreement of the parties hereto is comprised of each and every provisions hereof, and no provisions shall individually be held unenforceable for lack of mutuality. Subcontractor shall be bound by any labor agreement executed by Contractor or Owner to the extent required by such agreement. This Subcontract may be amended or modified only by a written addendum signed by both parties to the Subcontract. This Subcontract constitutes the entire agreement between the parties, and may not be amended except by written agreement executed by the parties.  If there is any conflict between the terms and conditions of this Subcontract and the terms and conditions of the Contract, the terms and conditions imposing a greater burden on Subcontractor shall prevail.   This Subcontract constitutes the complete agreement between the parties and supersedes any and all prior understandings, conversations, and proposals.

© 2001 APAC, Inc. Unauthorized Reproduction or Use in Any Form is Strictly Prohibited

Subcontract No. 352208.02

20.    INDEPENDENT CONTRACTOR:  Subcontractor agrees that it is, and will remain throughout the life of this Subcontract, an independent contractor solely responsible for performing the details of the Work to the extent necessary to avoid any claim or assertion of an employer-employee relationship between Contractor and Subcontractor's employees, and an employing unit subject to and in compliance with all applicable tax, unemployment compensation, workers compensation and other laws.  SUBCONTRACTOR STATUS: Subcontractor represents and warrants that it is a (check one)__X___ corporation _____ partnership _____ sole proprietorship.                                       Its federal tax identification number is _06-0613324_____

21.    SATISFACTORY COMPLETION:   The work shall not be deemed to be satisfactorily completed unless and until (a) final quantities for the Work have been agreed upon by Owner and Subcontractor in writing; (b) the Work has been formally inspected and accepted by the Owner in writing; (c) Subcontractor has reimbursed Contractor for any liquidated damages and other penalties assessed against Subcontractor and for any overpayments received by Subcontractor; and (d)   Subcontractor has, in Contractor's sole discretion, complied all requirements of the Subcontractor, including but not limited to the following:   (I) Subcontractor has furnished all required manuals, operating instructions, test reports, material certifications, and similar items required by the specifications and to the satisfaction of the Owner; (ii) Subcontractor has submitted all certified payrolls and other information required by the Owner; and (iii) Subcontractor has satisfied all outstanding claims for labor, materials, and equipment used or consumed during the Work.

22.    SPECIAL PROVISIONS:  (If none, so state.)

A.  SEE ATTACHMENTS – Attachment "A", Standard Addendum to Subcontract – Costello Industries, Inc., and APAC-Georgia, Inc. Ballenger Paving Division – Attachments to Standard Subcontract Agreement.

B.  None of the Special Provisions shall alter any of the remaining provisions within the Subcontract or alter the effect of any.

C.  Payment for the cost of performance and payment bonds to be based upon actual invoice of the bonds from Costello's surety.  Payment for the bonds will not exceed 0.72% of the total value of the schedule of Work shown on page seven (7).

This Subcontract is effective upon the later of the two dates shown below.

SUBCONTRACTOR:

Costello Industries, Inc.

By: _____

FRANK COSTELLO
Print Name

Title: _PRESIDENT_____

Date: __JULY 26, 2002_____


CONTRACTOR:

APAC Georgia, Inc.

By: _Ronald C. Ashmore_____

Ronald C. Ashmore
Print Name

Title: _Vice President_____

Date: _7/30/02_____

© 2001 APAC, Inc.  Unauthorized Reproduction or Use in Any Form is Strictly Prohibited

Subcontract No. __392208.02__
Revised 07/30/02

# ATTACHMENT
## TO SUBCONTRACT AGREEMENT WITH
### Costello Industries, Inc.

| LINE NO. | ITEM NO. | DESCRIPTION | ESTIMATED QUANTITY | UNIT | UNIT PRICE | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 0005A | 150-1000 | TRAFFIC CONTROL - (PARTIAL FOR OTHER SUBS) | 252,840.000 | SY | 0.14 | $35,397.60 |
| 0040 | 407-0020 | ASPHALTIC-RUBBER JOINT AND CRACK SEAL, TP S | 109,000.000 | LF | 0.60 | $65,400.00 |
| 0063 | 439-0108 | CONT REINF CONC PVMT, CL HES CONC, 8 INCH THICK (PARTIAL) | 75,000.000 | SY | 1.00 | $75,000.00 |
| 0063A | 439-0108 | PARTIAL ISOLATED SLAB LOCATIONS | 1,657.000 | SY | 119.69 | $198,326.33 |
| 0070A | 452-1000 | FULL DEPTH SLAB REPLACEMENT - GREEN SAW | 310.000 | CY | 4.68 | $1,450.80 |
| 0070B | 452-1000 | FD SLAB REPLACEMENT - SECOND CUT & SEAL | 310.000 | CY | 10.00 | $3,100.00 |
| 0080 | 461-1000 | RESEALING ROADWAY JOINTS AND CRACKS, TP-A | 62,725.000 | LF | 1.35 | $84,678.75 |
| 0083 | 609-1000 | REMOVE ROADWAY SLAB, CRCP LANE REMOVAL | 73,343.000 | SY | 16.69 | $1,224,094.67 |
| 0083A | 609-1000 | REMOVE ROADWAY SLAB FOR CRCP ISOLATED SLAB REPLACEMENTS | 1,657.000 | SY | 81.39 | $134,863.23 |
| 0083B | 609-1000 | REMOVE ROADWAY SLAB; REST AREA ON RAMP | 950.000 | SY | 16.69 | $15,855.50 |

**ESTIMATE TOTAL**   $1,838,166.88

Quantities are estimates only, and payment shall be based upon the actual quantities of Work performed at the specified unit prices as accepted and paid for by Owner, unless the words "Lump Sum" appear below the Estimated Amount for an item of Work. All applicable taxes, fees, and other costs and expenses of any nature whatsoever are included in the price(s). Any portion of the Work performed prior to the execution of this Subcontract shall be governed by and subject to the terms and conditions of this Subcontract.

**ADDITIONAL CONDITIONS:**

1. The Subcontractor is to clean up any trash and any Hazardous Spills caused by same.

2. Price for Removal Item 83 includes removal and clean up of existing concrete and asphalt stockpiles behind the weigh station.

3. One mobilization each is included for each of the above items.

4. The above prices for items 0083, 0083A and 0083B include providing a dumpsite for the existing concrete and asphalt stockpiles. Slurry from grinding operation and existing roadway slabs to be removed.

5. Subbase deficiencies encountered during the removal operations excluded. Specifically any grading excavation or back filling operations with the exception of item 0083A removal of concrete slabs for isolated replacements.

6. The Contractor is to provide and maintain the necessary and acceptable traffic control devices for the Subcontractor to set closures in accordance with the specifications for closures. The Subcontractor includes traffic control with Contractor furnished devices for Line No. items 0040, 0063, 0070B, 0080, and 0083A. The Subcontractor will also handle all traffic control with Contractor furnished devices for Line No. item 0055 (Grind Concrete Pavement) and will receive compensation for this work under item 005A. The scope of providing traffic control for the grinding subcontractor is limited to 42 closures/shifts. Furthermore the Subcontractor has agreed, while they are onsite for either their work or the grinding work, to the setting out, the monitoring, and the picking up of closures for other concurrent subcontractors (temp. paint, permanent

ATTACHMENT "A"
TO SUBCONTRACT AGREEMENT WITH
Costello Industries, Inc.

paint, & glare screen, etc.). The Subcontractor has no responsibility for closures for guardrail and asphalt paving. The Contractor is responsible for closures for concrete paving, Line No. 0083 and 0083B (Remove Roadway Slabs) and 0070A (Green Sawing).

7. The Contractor has purchased enough devices for 3 closures for this project. There will be enough devices for 4 closures on the Bibb, Crawford, Peach Counties project. The Subcontractor will be allowed at least two closures for their work. More maybe possible with shifting of devices between the two projects. The Subcontractor will be given preference for closures and devices, however final **priority** will be determined by the Contractor's Project Manager. If Sunday closures are required to support operations other than those of the Subcontractor, there will be an additional $ 2,324.00 per day charge paid to the Subcontractor. For additional closures furnished by the Subcontractor beyond the 42 shifts for the grinding, the additional charge Monday through Saturday will be $1,825.00/day and $2,324.00/day for additional Sunday closures.

8. The Contractor is to provide on-site staging area adjacent to the project limits at no cost to the Subcontractor. The Contractor to provide water source (Hydrant or pressurized hose) within project limits for all of the Subcontractor's work, with no cost to the Subcontractor.

9. Pricing for Items 0063 is based on a longitudinal joints only. Layout for the joints is to be furnished by the Contractor.

10. Subcontractor requires a minimum of 6 weeks notice for crew scheduling per move-in.

11. Line No. 0083, 0083A and 0083B - Subcontractor will squeegee slurry from deep sawing operation to the side of the roadway.

12. Line No. 0070A - Any additional green sawing will be done by Subcontractor at an additional charge of $0.55 per linear foot.

13. Item 0063A is based on APAC supplying all required steel and tying material in the on-site staging area.

Initial

Revised 07/30/02

© 2001 APAC, Inc. Unauthorized Reproduction or Use in Any Form is Strictly Prohibited

## APAC-GEORGIA, INC. BALLENGER PAVING DIVISION
### ATTACHMENTS TO STANDARD SUBCONTRACT AGREEMENT

PROJECT # ___GDOT NHS-M001-00(691)01_____ COUNTY __Monroe_____

SUBCONTRACTOR ___Costello Industries, Inc_____ DATE ___July 12, 2002___

    The following provisions indicated with (X) are made an integral part of this Subcontract and should be executed, initialed, and submitted as indicated. The Subcontractor will be responsible for the prompt submission of all reports, payrolls, and certifications required by the owner's contract or Federal or State agencies even though they may not be specifically noted herein. Failure to submit the required documents can result in the owner withholding amounts due for work performed.

### Please acknowledge each item (X) by initialing.

___RC___ (X) Furnish Certificates of Insurance as specified in the Contract with the owner and/or this Subcontract. Statutory Workmen's Comp., Public Liability, Property Damage and Vehicle Liability.

___P7___ (X) Furnish Bond - PERFORMANCE AND PAYMENT ON ATTACHED FORMS

___RC___ (X) Furnish evidence of valid Sales and Use Bond Tax to eliminate retainage of such taxes by Contractor. (GA ACT 180, HB214, Reg. 560-2-2-26)

___RC___ (X) Attached Wage Rate Schedule. Submit weekly Certified Payrolls and Payroll Certifications on the appropriate form as required by the owner, to Ballenger Paving Div. no later than five working days after close of the payroll period. For any period during which there is no work, a "No Work Report" should be submitted. Indicate Race and Sex for each employee. Refer to Form FHWA-1273 for payroll requirements.

___RC___ (X) Attached Form FHWA-1273.

___RC___ (X) Attached Female and Minority Goals. Executive Order 11246.

___RC___ (X) Attached Standard Federal EEO Construction Contract Specifications.

___RC___ (X) Execute attached certification as to non-segregated facilities.

___RC___ (X) Note and Initial the attached Ballenger Paving Co. Division of APAC-Georgia, Inc. Statement of EEO Policy, Substance Abuse Policy, Hazardous Materials Policy, and Anti-Harassment Policy.

___RC___ (X) Submit Form PR-1391 in duplicate first three months & every July until project is completed.

___RC___ (X) Subcontractor to submit their Equal Employment Statement of Policy and post copy on project bulletin board.

___RC___ (X) Subcontractor is to comply with all Federal, State and Local labor and safety regulations.

___RC___ (X) Subcontractor is to ~~furnish~~, maintain and remove any traffic or safety devices required during the performance of his work.

___RC___ (X) Drug-Free workplace Certification.

___RC___ (X) Subcontractor is to develop and maintain a written Hazards Communication Program.

___RC___ (X) Telephone # ( 860) 666-3311

Employer Federal I.D.# _06-0613324_

BY _____
    SUBCONTRACTOR: Costello Industries, Inc.

BY: _Ronald C. Okmurra_
    APAC-Georgia, Inc. Ballenger Paving Division

### REMINDER: INITIAL EACH ITEM ABOVE INDICATED BY (X)

© 2001 APAC, Inc. Unauthorized Reproduction or Use in Any Form is Strictly Prohibited

# STANDARD ADDENDUM to SUBCONTRACT
## COSTELLO INDUSTRIES, INC.

It is agreed to by the parties that portions of the above-noted Subcontract dated the _____ day of __JULY__, 2002 between APAC-Georgia, Inc., Ballenger Paving Division (Contractor) and Costello Industries, Inc. (Subcontractor) are hereby amended as listed below. It is further agreed that if any of the terms of the Subcontract (to which this addendum is attached) are inconsistent with any of the terms of this standard addendum, then this addendum shall be controlling and the parties shall be bound by the terms and conditions below.

a.      Investigation and Right to Rely – Subcontractor shall be responsible for investigating the site conditions of the Work and is assumed to be knowledgeable in regards to the scope and character of the Work. In addition, Subcontractor shall rely on plans, drawings, specifications and other information provided by the Contractor, Owner, or representative of each, and assumes no risk for unknown or unforeseen conditions not evident from the plans, drawings, specifications, or other information provided to Subcontractor, and upon which he could in no way ascertain a cost.

b.      Backcharges – No backcharges or claim of the Contractor for services shall be valid except by an agreement in writing by the Subcontractor before the work is executed, except in the case of the Subcontractor's failure to meet any requirement of the subcontract agreement. In such event, the Contractor shall notify the Subcontractor of such default, in writing, and allow the Subcontractor 5 days to correct any deficiency before incurring any cost chargeable to subcontractor. This amends § 14 of the Subcontract, increasing the time to remedy from 12 hours notice.

c.      Time for Performance – Subcontractor shall not be responsible for delays caused wholly by the Owner, Contractor, and their agents or representatives. Subcontractor shall be entitled to equitable adjustment in the subcontract amount for delays insofar as is provided and allowed in the Owner Contractor agreement. This amends § 9 of the subcontract.

d.      Labor – Subcontractor shall not be bound by any of Contractor's labor agreements (in whole or in part).

e.      Liquidated Damages – The Contractor shall make no demand for liquidated damages for delays in any sum in excess of such amounts as may be specifically named in the Contract and no liquidated damages may be assessed against Subcontractor for more than the amount paid by the Contractor for unexcused delays to the extent actually caused by the Subcontractor.

f.      Indemnity – Paragraph 6 of the Subcontract Agreement shall be amended by deleting the words "wholly or" in the sixth line.

g.      Mid- Month Estimate -  Whenever Subcontractor has earned sufficient dollar amount ($225,000) or more in the 1st 2 weeks of any month or 30 day estimate period, and said work is properly owing  under the Contract requirements, and when combined with the value of work by others exceeds the threshold provided under the Contract, Contractor will then submit a mid-month application for payment of said sums to the Owner

_Contractor:_                                           _Subcontractor:_

APAC-Georgia, Inc., Ballenger Paving Division          Costello Industries, Inc.

By _____                          By _____

                                                         Frank Costello
                                                         President
Title _____                       Title _____

EXHIBIT B

## SUBCONTRACTOR'S CERTIFICATE OF INSURANCE

| NAME AND ADDRESS OF INSURED | CERTIFICATE HOLDER |
|---|---|
| Costello Industries, Inc.<br>P.O. Box 310444<br>Newington, CT 06131-0444 | APAC-Georgia, Inc.<br>P.O. Box 127<br>Greenville, SC 29602 |

This is to certify that policies of insurance listed below have been issued to the insured named above and are in force at this time.

| Type of Insurance | Company/Policy Number | Policy Period | Limits | | Min. Req'd | Insured's Limits |
|---|---|---|---|---|---|---|
| **GENERAL LIABILITY**<br>☒ Commercial General Liability<br>☒ Occurrence Form<br>☒ Premises - Operations<br>☒ Completed Operations<br>☒ Independent Contractors<br>☐ Blanket Contractual<br>☒ Broad Form Property Damage<br>☒ Product Liability<br>☒ Collapse/Underground Hazard<br>☒ Blasting/Explosion Hazard<br>☐ Professional Liability | YY2111255119-022 | 10/1/02-03 | General Aggregate | | $1,000,000 | $ 2,000,000 |
| | | | Products-Com/Op Agg. | | $1,000,000 | $ 2,000,000 |
| | | | Personal & Adv. Injury | | $1,000,000 | $ 1,000,000 |
| | | | Each Occurrence | | $1,000,000 | $ 1,000,000 |
| **AUTOMOBILE LIABILITY**<br>☒ Occurrence Form<br>☒ Any Auto<br>☐ All Owned Autos<br>☐ Scheduled Autos<br>☒ Hired Autos<br>☒ Non-Owned Autos | AS2111255119-032 | 10/1/02-03 | Combined Single Limit | | $1,000,000 | $ 1,000,000 |
| | | | Bodily Injury (Per Person) | | | $ |
| | | | Bodily Injury (Per Accident) | | | $ |
| | | | Property Damage | | | $ |
| **EXCESS LIABILITY**<br>☒ Umbrella Form<br>☐ Other Than Umbrella Form<br>☒ Occurrence Form | 4102-4203 | 10/1/02-03 | Each Occurrence | | | $ 10,000,000 |
| | | | Aggregate | | | $ 10,000,000 |
| ☒ WORKERS COMP AND EMPLOYERS LIABILITY<br>The Proprietor/Partners/ ☒ Inc.<br>Executive Officers are: ☐ Exc. | WC2111255119-012 | 10/1/02-03 | Statutory Limits | | | |
| | | | Each Accident | | $1,000,000 | $ 500,000 |
| | | | Disease - Policy Limit | | $1,000,000 | $ 500,000 |
| | | | Disease - Each Employee | | $1,000,000 | $ 500,000 |
| **OTHER INSURANCE**<br>☐ Builder's Risk<br>☐ | | | | | $ | $ |
| | | | | | $ | $ |

NOTE:
A. All policies of insurance (except Workers' Compensation and Employers' Liability) have been endorsed to name APAC-Georgia, Inc. as an Additional Insured with primary coverage, and such policies provide that the insurance applies separately to each insured against whom claim is made or suit is brought, except with respect to the policy limits.

B. All policies of insurance contain a clause waiving rights of subrogation against APAC-Georgia, Inc. and its officers, directors, employees, and affiliates.

C. The issuing company will deliver to the certificate holder at least thirty (30) days' advance written notice of cancellation of any policy or any material change in coverages or limits.

TYPE AND LOCATION OF WORK TO BE PERFORMED BY INSURED:
PD slab replacement & roadway joint & crack seal for Monroe, Project: Reconstruction on I-75,; BPD Project No. 392208

| NAME AND ADDRESS OF AUTHORIZED REPRESENTATIVE: | DATE ISSUED:   January 22, 2003 |
|---|---|
| Thomas J. Stack<br>Lockton Companies, Inc.<br>80 Scott Swamp Road, Suite 202<br>Farmington, CT 06032 | *Thomas J Stack*<br>AUTHORIZED REPRESENTATIVE |

©1997 APAC, Inc. Unauthorized Reproduction or Use in Any Form is Strictly Prohibited

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

James V. Chin, Esquire
Robins, Kaplan, Miller & Cirisi, L.L.P.
2600 One Atlanta Plaza
950 East Paces Ferry Road, N.E.
Atlanta, GA  303226-1119

This 17th day of July 2007.


/s/ M. Craig Hall
M. Craig Hall
GBN: 319220
Counsel for Defendant

Law Offices of M. Craig Hall, LLC
1535 Mt. Vernon Road, Suite 200
Dunwoody, GA 30338
(phone) 770/698/0555
(facsimile) 770/573/3601
Craighall@DunwoodyLawyers.com

## LOCAL RULE 7.1(D) CERTIFICATION

Pursuant to Local Rule 7.1(D), I hereby certify that this brief has been prepared with Times New Roman, 14 point.

/s/ M. Craig Hall
M. Craig Hall